No. 91,919

STATE OF KANSAS, *Appellee*, v. LANA C. JACKSON, *Appellant*.

(124 P.3d 460)

Opinion filed December 9, 2005.

*Jeremy J. Crist*, of Michael C. Brown, P.A., of Mulvane, argued the cause and was on the brief for appellant.

*Kristi L. Barton*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Phill Kline*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J., Retired: Lana C. Jackson appeals her conviction for felony murder based on the underlying felony of selling cocaine. Jackson asserts: (1) The murder did not occur during the course of the drug transaction; (2) an extraordinary, intervening event broke the causal connection between the drug transaction and the shooting that caused the death; and (3) the trial court failed to give Jackson's requested instruction regarding application of the felony-murder rule.

## FACTS

During the morning hours of December 31, 2001, Lana Jackson received a call from Russell Cope advising her that an individual wanted to purchase 4 1/2 ounces of powder cocaine. Jackson estimated that the purchase price of the cocaine was approximately $3,500. Jackson soon learned that the cocaine was for Bennie Zeigler, whom she had known for approximately 1 year and for whom she had arranged other drug transactions. Zeigler had always paid, so Jackson was comfortable dealing with Zeigler.

Jackson, who did not personally have drugs, contacted Erick Donaldson to see if Donaldson could supply the cocaine. Donaldson did not have 4 1/2 ounces of cocaine, so he contacted his friend Vernon Harris, who stated that he could supply the drugs. To complete the transaction, Jackson arranged to meet Cope and Zeigler at a car wash. After picking up Donaldson and Harris, Jackson drove to the car wash. Neither Cope nor Zeigler was there. Jackson then arranged to meet Cope and Zeigler at Joyland Amusement Park. When Jackson talked to Zeigler in the parking lot at Joyland, they decided not to complete the transaction there because it was too open. Jackson then suggested that they go to Patricia Shelinbarger's house to complete the transaction.

Cope did not go with Jackson and Zeigler to Shelinbarger's house. When they arrived at Shelinbarger's house, Jackson, Harris, and Zeigler went to Shelinbarger's door. Donaldson remained in

the backseat of Jackson's car. Shelinbarger's daughter told Jackson that Jackson could not come in the house. Unable to complete the transaction at Shelinbarger's house, the trio walked towards the cars, discussing what to do next.

Jackson's car was parked in the street, with the passenger's side facing Shelinbarger's house. Zeigler had parked his car approximately 10-15 feet behind Jackson's car, facing the same direction. Jackson stopped on the curb near the rear passenger's side of her car. Harris and Zeigler continued around to the driver's side of Zeigler's car. After Harris told Zeigler to give him everything, the two began hollering at each other. A fight broke out between Harris and Zeigler. Harris then punched Zeigler and sprayed him in the face with pepper spray. Ziegler pulled out a gun and hit Harris on the head with the gun. Harris, who also had a gun, shot Zeigler in the top of the head. Zeigler died from a single gunshot to the top of his head. Zeigler had $330 in his wallet. There were no drugs found on or around his body.

Immediately after Harris shot Zeigler, Jackson ran around to the driver's side door of her car. Harris pushed Jackson into the car, then crawled over her to the passenger's seat. Jackson drove away, then took Donaldson and Harris back to Harris' car.

Jackson was arrested approximately 2 weeks later. Jackson waived her *Miranda* rights and agreed to talk to Detective Chisholm. Jackson told Detective Chisholm that she, Zeigler, and Harris had discussed going to Zeigler's mother's house, which was around the corner, to complete the transaction after they were denied entrance to Shelinbarger's house. Jackson informed Detective Chisholm that Donaldson and Harris divided the money Harris had taken from Zeigler.

The State charged Jackson with felony murder based on the death during the underlying felony of selling cocaine or, in the alternative, felony murder based on the underlying felony of aggravated robbery. When the jury could not reach a unanimous verdict, Jackson's first trial ended in a mistrial. After hearing the evidence in her second trial, that jury convicted Jackson of felony murder based on the underlying felony of selling cocaine. The district judge sentenced Jackson to life in prison without the possi-

bility of parole for 20 years. Jackson appeals her conviction directly to this court pursuant to K.S.A. 22-3601(b)(1). Jackson asserts (1) the murder did not occur during the course of a drug transaction, (2) an extraordinary, intervening event broke the connection between the drug transaction and the shooting that caused the death, and (3) the trial court failed to give her requested felony murder instruction.

## ANALYSIS

I. Did the murder occur during the course of the drug transaction?

Jackson claims that Zeigler's murder was not part of the res gestae of the drug transaction because she had abandoned the drug sale prior to Zeigler's murder. Jackson argues that there was a break in the chain of events when she, Harris, and Zeigler were denied access to Shelinbarger's house.

An appellate court reviews this issue like any other challenge to the sufficiency of the evidence. All of the evidence is reviewed in a light most favorable to the State. If that review supports the rational factfinder's conclusion that the murder occurred during the res gestae of the underlying crime, then this court must uphold the defendant's conviction for felony murder. Generally, whether the underlying felony was abandoned or completed before the murder is a question of fact for the jury to decide. *State v. Beach*, 275 Kan. 603, 610-11, 67 P.3d 121 (2003). An appellate court does not determine whether the evidence is incompatible with any reasonable hypothesis except guilt. That function remains with the jury and the trial court. Rather, an appellate court is "limited to ascertaining whether there was a basis in the evidence for a reasonable inference of guilt." *State v. Boone*, 277 Kan. 208, 217, 83 P.3d 195 (2004). Regardless of whether the evidence supports another theory of the events, an appellate court's function is to determine whether there is a basis in the evidence to support the jury's guilty verdict. *Boone*, 277 Kan. at 218.

K.S.A. 21-3401(b) defines felony murder as "the killing of a human being committed . . . in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in

K.S.A. 21-3436 and amendments thereto." Selling or offering to sell cocaine is an inherently dangerous felony. See K.S.A. 2004 Supp. 21-3436(a)(14); K.S.A. 2004 Supp. 65-4101(p)(4); K.S.A. 2004 Supp. 65-4161. Anyone who "intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime" is criminally liable for the crime committed by another person, including any crimes that are reasonably foreseeable as a probable consequence of committing or attempting to commit the intended crime. K.S.A. 21-3205(1) and (2).

The felony-murder rule applies when the victim's death occurs within the res gestae of the underlying felony. *Beach*, 275 Kan. at 610. Res gestae has been defined as those acts done before, during, or after the happening of the principal occurrence when those acts are so closely connected with the principal occurrence as to form, in reality, a part of the occurrence. *State v. Peterson*, 236 Kan. 821, 829, 696 P.2d 387 (1985).

Jackson argues that the drug transaction ended when she, Harris, and Zeigler were denied access to Shelinbarger's house. This argument overlooks some evidence in the record. Although Jackson did not shoot Zeigler, she arranged the drug transaction that led to Zeigler's death. To complete the drug transaction, Jackson was required to arrange three different meeting places. When the first meeting location fell through, Jackson communicated with Zeigler and arranged a second location for the transaction. When the second location was determined to be unacceptable, Jackson again communicated with Zeigler to coordinate the sale at a third location, Shelinbarger's house. Jackson explained to Detective Chisholm that when Shelinbarger's house was unacceptable, they were in the process of determining how to complete the sale as they were walking away from Shelinbarger's house. Jackson stated to Detective Chisholm that she believed they were going to find a place to finalize the drug transaction. One possibility was going to Zeigler's mother's house, which was located just around the corner. These statements indicate Jackson's belief that the drug transaction had not been abandoned or terminated when Harris shot Zeigler.

Jackson and Zeigler had attempted to complete the drug transaction at three different places. Based on the defendant's state-

ments, it was reasonable for the jury to infer that the individuals would arrange another place to complete the drug transaction. Under such circumstances, the drug transaction had not been completed but was still in process when Harris shot Zeigler. When this evidence is viewed in a light most favorable to the State, it supports the jury's conclusion that Zeigler's murder occurred during the drug transaction.

II. Did an extraordinary intervening event break the causal connection between the drug transaction and the shooting that caused Zeigler's death?

Next, Jackson argues that Harris' act of shooting Zeigler was an extraordinary, intervening event that broke the causal connection between the drug transaction and the murder. Jackson asserts that she did not know that Harris had a gun or that Harris would shoot Zeigler to obtain Zeigler's money. She claims that because she had no control over Harris' actions, she cannot be found criminally liable for Harris' actions.

The standard of review for determining whether there is a causal connection between the murder and the underlying felony requires this court to examine the sufficiency of the evidence to support the felony-murder conviction. This standard requires an appellate court to review the evidence in a light most favorable to the State. *Beach*, 275 Kan. at 611.

The facts in this case are similar to the facts in *Beach*. Rebecca Beach was convicted of felony murder based on the underlying felony of selling methamphetamine. The victim, Grant, used Beach to coordinate his methamphetamine purchases. When Grant wanted to purchase methamphetamine, he called Beach, who arranged a meeting between Grant and a supplier. Grant would then pick up Beach, and they would drive to a location that Beach had arranged for the transaction. On the day of Grant's murder, Beach could not contact her normal suppliers, but her companion, Arevalo, told her that he could get the drugs. Arevalo contacted Jiminez, then informed Beach that Jiminez could supply the drugs. Beach drove Arevalo and Jiminez to the location she had arranged for the transaction. Arevalo and Jiminez waited while Beach left to

get Grant and return to complete the drug transaction. After Grant gave Beach the money for the drugs, Beach went into the house, allegedly to exchange the money for the drugs. As Beach entered the house, Arevalo shot and killed Grant. Beach then left the scene with Arevalo and Jiminez. At trial, the jury was instructed to convict Beach of felony murder if it found Grant was killed "while in the commission of, or attempt to commit, or in the flight from committing" sale of methamphetamine or aggravated robbery. 275 Kan. at 609.

On appeal, Beach claimed that she did not know Arevalo and Jiminez were planning to kill Grant; therefore, Arevalo's act of shooting Grant was an extraordinary intervening act which broke the causal connection between the drug transaction and Grant's murder. 275 Kan. at 612. The *Beach* court first noted that the felony-murder rule requires a direct causal connection between the commission of the felony and the homicide. However, unlike the general rules of proximate cause used in civil actions, a defendant will be held liable for a death that occurs during the commission of a felony unless there is an extraordinary intervening event that supercedes the defendant's act and becomes the sole legal cause of death. 275 Kan. at 612. In determining whether there was a causal relationship, the *Beach* court observed that the " '[t]ime, distance, and the causal relationship between the underlying felony and the killing are factors to be considered in determining whether the killing is a part of the felony.' " 275 Kan. at 613 (quoting *State v. Hearron*, 228 Kan. 693, 696, 619 P.2d 1157 [1980]).

After considering the time factor between the sale of methamphetamine and Grant's murder, the *Beach* court concluded that the two events took place at the same time because Beach was on her way to exchange Grant's money for the drugs. Therefore, the time factor supported Beach's conviction. The *Beach* court noted that Beach had arranged the location for the drug transaction and led Grant to that location. The *Beach* court then considered the distance between the shooting and the drug transaction and determined that it supported Beach's conviction, as well.

In reaching this conclusion, the *Beach* court first acknowledged that Beach had a "visceral argument that Arevalo's appearance with

guns blazing constitute[d] an 'extraordinary intervening event.'" 275 Kan. at 613. Nevertheless, the *Beach* court rejected that argument by noting Beach's participation in the drug transaction. Beach had coordinated the plan to sell drugs and had informed Arevalo that Grant would have a large amount of cash. Under these circumstances, it was foreseeable that a person with a lot of cash who was intent on engaging in illegal drug activity would be a target for violence. The *Beach* court then concluded that Arevalo's act was not an extraordinary, intervening act. 275 Kan. at 613-14.

The same analysis applies to the facts in this case. The time factor supports Jackson's conviction. Harris shot Zeigler while they were in the process of completing the drug transaction. Jackson told Detective Chisholm that Harris and Zeigler were attempting to decide what to do next and had considered going to Zeigler's mother's house, which was just around the corner. Although it was going to take less than a minute to complete the transaction, Jackson did not want to conduct business in the open. She and Zeigler had attempted to complete the transaction in three different locations at that point. Under these facts, the jury could have reasonably inferred that they would again attempt to complete the transaction in another location. Even though they were not in the process of exchanging drugs and money when the shooting occurred, the evidence supports the inference that the drug transaction was ongoing; therefore, the shooting and the drug transaction were occurring simultaneously.

In addition, the distance factor supports Jackson's conviction for felony murder. After being denied access to Shelinbarger's house, Jackson, Zeigler, and Harris walked a short distance between Shelinbarger's front door and the cars on the street. Shelinbarger described Jackson's, Harris', and Zeigler's demeanors as friendly during the walk back to the cars. Detective Chisholm testified that Jackson stated they were talking about what to do next. Jackson testified that Harris, who had the drugs, and Zeigler were talking to each other as they returned to the cars. The conversation regarding where to go next to complete the drug transaction occurred just a few feet from the shooting. Thus, the evidence supports the

inference that the shooting and the drug sale took place in the same location.

Jackson's argument that she did not know Harris had a gun and intended to shoot Zeigler is analogous to Beach's argument that Arevalo's act was an extraordinary intervening act. The *Beach* court rejected that argument. We note that Harris learned about Zeigler's drug transaction from Jackson. Jackson had made it clear to Donaldson and Harris that Zeigler wanted to buy 4 1/2 ounces of cocaine, valued at approximately $3,500. Having sold drugs to Zeigler on several previous occasions, Jackson knew that Zeigler had the money to purchase the drugs. Jackson also acknowledged that selling drugs is a dangerous business and that most people carry guns to protect themselves during drug transactions. Based on this evidence, the jury could infer that Zeigler's murder had a causal connection with the drug transaction arranged and facilitated by Jackson. It was therefore foreseeable that Zeigler could be a target for violence. See *Beach*, 275 Kan. at 614, 625-26.

After reviewing the evidence in the light most favorable to the State, we find there is sufficient evidence to support the jury's conclusion that Zeigler's death was not the result of an extraordinary intervening act by Harris. Rather, the time, distance, and causal relationship between Zeigler's death and the drug transaction support the jury's conclusion that Harris's act of shooting Zeigler was not an extraordinary intervening act.

III.  Did the trial court err in refusing to give Jackson's requested instruction regarding application of the felony-murder rule?

Finally, Jackson argues that the trial court failed to give this requested jury instruction regarding the causal connection between the drug transaction and Zeigler's death:

"Time, distance, and the causal relationship between the underlying felony and the killing are factors to be considered in determining whether the killing was part of the felony, and, therefore, subject to the felony-murder rule. Whether the underlying felony had been abandoned or completed prior to the killing so as to remove it from the ambit of the felony-murder rule is ordinarily a question of fact for the jury to decide."

Jackson requested the instruction at trial. When the trial court refuses to give a requested instruction, an appellate court must

view the evidence in a light most favorable to the party requesting the instruction. A defendant is entitled to an instruction on his or her theory of the case, even if the evidence of the theory is slight and supported only by the defendant's own testimony. However, an appellate court cannot consider the requested instruction in isolation. Rather, the court must consider all of the instructions together as a whole. If the instructions as a whole properly and fairly state the law as applied to the facts of the case, and the jury could not reasonably be mislead by them, the instructions are not reversible error even if they are in some way erroneous. *Beach*, 275 Kan. at 624-25.

Jackson argues that her requested instruction properly recites the law. She asserts that without the instruction, the jury could not consider whether she had withdrawn from the drug transaction at the time of the shooting. We note that in *Beach*, the defendant requested a jury instruction regarding the foreseeability of a murder during a drug transaction. The *Beach* court held that the failure to give that instruction was not erroneous because PIK Crim. 3d 56.02 provides the elements for felony murder and properly and fairly states the law regarding causation for a felony murder. 275 Kan. at 625.

In reaching this conclusion, the *Beach* court relied on *State v. LaMae*, 268 Kan. 544, 998 P.2d 106 (2000):

" 'PIK Crim. 3d 56.02 sufficiently incorporates the causation required under the law. The instructions require not only that the death occur during the commission of the felony but that the killing actually be perpetrated by the defendant or another in the commission of the felony. An extraordinary intervening cause would negate this latter element. Thus, if the jury found that the defendant or another was responsible for the death in the commission of the felony, the jury by definition found that no extraordinary intervening cause existed that was the sole cause of the death.' " *Beach*, 275 Kan. at 625 (quoting *LaMae*, 268 Kan. at 555).

The same analysis applies in this case. The court gave the following instruction for felony murder from PIK Crim. 3d 56.02:

"The defendant is charged in Count 1 with the crime of murder in the first degree. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. That the defendant or another killed Bennie L. Zeigler;

"2. That such killing was done *while in the commission of or attempting to commit sale of cocaine*, and
"3. That this act occurred on or about the 31st day of December, 2001, in Sedgwick County, Kansas." (Emphasis added.)

Immediately preceding the felony-murder instruction, the trial court instructed the jury regarding how to determine guilt or innocence, stating:

"The State has the burden to prove the defendant is guilty. The defendant is not required to prove she is not guilty. You must presume that she is not guilty until you are convinced from the evidence that she is guilty.

"The test you must use in determining whether the defendant is guilty or not is this: If you have a reasonable doubt as to the truth of any claims required to be proved by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of any of the claims required to be proved by the State, you should find the defendant guilty."

PIK Crim. 3d 56.02 requires the jury to find that the killing was done *while* the felony was being committed or attempted. If the jury had found that the drug transaction was over or that Jackson had abandoned the drug transaction when Harris shot Zeigler, that claim in the felony-murder instruction would not have been satisfied, and the instructions would have required the jury to acquit Jackson. However, the jury's verdict, finding Jackson guilty of felony murder based on the underlying felony of selling cocaine and not guilty of felony murder based on aggravated robbery, indicates that the jury had determined that Jackson had not withdrawn from the drug transaction.

In addition, Jackson's trial counsel stated the substance of the instruction in his closing arguments to the jury, stating:

"[T]here's a case, and it says, time, distance, and the causal relationship between the underlying felony and the killing are factors to be considered in determining whether the killing is a part of . . . the sale of cocaine. And I would tell you, submit to you, that if those guys are going out to rob him and they know it and she doesn't, the sale of cocaine didn't lead to [Bennie Zeigler's] death. The actions of Erick and Vernon led to Bennie Zeigler's death."

Although the closing statements from Jackson's trial counsel do not have the same effect as jury instructions, the instructions, when considered as a whole, fairly and properly stated the law as applied

to the facts without confusing the jury. The trial court did not err when it denied Jackson's request for the additional instruction.

Affirmed.

LOCKETT, J., Retired, assigned.